IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOHN WILLIAM BARRETT                                                                    PLAINTIFF

V.                                                           CAUSE NO. 3:13-CV-1045-CWR-FKB

HEALTH ASSURANCE INC., ET AL.                                                        DEFENDANTS

## ORDER

Before the Court are the remaining defendants' motion for summary judgment, the Magistrate Judge's Report and Recommendation (R&R) on that motion, the plaintiff's objection to that R&R, the plaintiff's motion to amend his objection, and the plaintiff's motion for judgment as a matter of law. A hearing was held on the first three items. Having reviewed the record and considered the parties' arguments, the Court is now ready to rule.

**I.      Background**

John Barrett alleges that Health Assurance and a number of its officers and employees failed to provide him adequate medical care at East Mississippi Correctional Facility. At his *Spears* hearing he claimed that Health Assurance had a policy or practice of shuttling inmates back and forth between two doctors, neither of which truly resolved his problems, and that Health Assurance stopped giving him medication for a month when it took over the facility's medical contract in July 2012. His claims against individual actors – mainly doctors and nurses – center on their various failures to refill prescriptions, among other misdeeds.

Barrett has filed dozens of sick call requests, sees medical providers several times a month, and often has 10 or more outstanding prescriptions a month. That makes for a complicated record. As the Magistrate Judge suggested in his R&R, the sheer number of

interactions Barrett has with medical providers lends itself to skepticism that those providers or their employer could somehow be indifferent to his serious medical needs.

This Court's independent review of the record confirms that such skepticism is largely warranted. Some of the providers named in this suit are indeed entitled to the summary judgment they seek. Nevertheless, a painstaking review of the record also shows a fact dispute on one part of Barrett's claims. The Court is therefore required to deny summary judgment in part and set the case for trial.

## II.    Law

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. *Id.* at 56(c)(1). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither conclusory allegations nor unsubstantiated assertions will satisfy the nonmovant's burden." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (quotation marks and citations omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

**B.** **Constitutional Standard**

"A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quotation marks and citations omitted).

**III.** **Discussion**

We begin by discussing the state of Health Assurance's medical records. The documents the company provided to the Magistrate Judge were rife with discrepancies. Some of Barrett's records were logged in the chart but not produced. Others were produced but not logged. At least one record of significance was logged months after Barrett initiated this lawsuit, with all the indicia of reliability that suggests. The voluminous production had heft but carried little weight.

Also troubling is the lack of factual investigation Barrett was permitted to do to advance his case. He asked the warden if he could take statements from other inmates and was denied. He asked Health Assurance's attorney for "a complete set of sick call request[s]" and was refused. He says two nurses told him to subpoena them to provide evidence about the deficiencies in his medical care and records, but has not been permitted to pursue those leads. It is not clear how an inmate can prosecute a deliberate indifference claim without proper access to critical information, at least some of which the rules allow him to have.

Because of these evidentiary problems, Barrett has requested an adverse instruction to be given at trial. The issue cannot be adjudicated now because, at the Court's request, Health Assurance subsequently provided additional medical records to him and to the Court, and that

3

supplementation may have adequately resolved the concern. *See* Docket No. 88. The issue will have to be carried with the case.

The formal analysis follows. It begins with Barrett's administrative remedy request No. 12-725.

### A. ARP 12-725

In 12-725, Barrett says he was denied medical care and prescriptions between July 18 and 28, 2012. Docket No. 77-3, at 23-26. The record shows that MTC had taken over the facility on July 19, 2012 and immediately experienced significant problems filling prescriptions for inmates.

Barrett's description of this time is grim. A layperson reading it would likely conclude that something in the facility had gone seriously wrong. When a 1,000+ inmate prison that is explicitly designed to serve persons with serious mental illness runs out of medication for more than a week, something *has* gone seriously wrong. *See Dockery v. Fischer*, --- F. Supp. 3d ---, No. 3:13-CV-326-WHB-JCG, 2015 WL 5737608, at *1 (S.D. Miss. Sept. 29, 2015) (noting EMCF's focus on mentally ill prisoners and describing pending class action allegations of constitutionally deficient medical care at the facility).

Among the distressing things Barrett allegedly experienced during this time, however, the only one which could rise to the level of deliberate indifference is Nurse Mitchell's refusal to treat him. And Barrett, although he named a number of defendants, did not name Nurse Mitchell as a defendant in his complaint.

Because of this procedural defect, the R&R is adopted on this ARP and the defendants are entitled to summary judgment on these claims.

**B.     ARP 13-838**

In 13-838, Barrett alleged that EMCF's only pain doctor, Dr. McShan, woefully under-dispensed prescribed medication and saw so patients so infrequently that Barrett regularly ran out of his medication and was then denied refills, causing substantial pain. This is the basis for Barrett's claim that Health Assurance engages in "shuttling" to deny medical treatment.

Despite a number of inconsistencies in the record, it is clear that in mid-2013, Barrett repeatedly filed sick call requests complaining about a lack of pain medication and treatment, and was seen by several different medical providers. It is necessary to detail that course of treatment to see whether a claim of deliberate indifference can proceed.

**1.     Timeline**

On April 25, 2013, Dr. Faulks saw Barrett and noted his pain. The doctor prescribed a Kenalog shot and referred him to Dr. McShan. There is no evidence the shot was administered, but we know from this visit (and from prior visits) that Dr. Faulks was aware of Barrett's problem and the need for referral.

On May 14, a nurse practitioner conducting a follow-up also mentioned Barrett's pain, which she described as arthritic. She referred him to the chronic pain doctor and adjusted some of his medications.

On May 28, Barrett saw Dr. McShan. Pain was again noted. Dr. McShan prescribed a 14-day supply of ibuprofen and a 4-day supply of prednisone. There is no record that either drug was given in May, but they do appear on the June charts up to their discontinuation dates.

There is no constitutional infirmity in these events. Barrett was treated and referred to an appropriate physician who prescribed pain medication. The length of the prescriptions is

questionable – they seem too short – but since we expect Dr. McShan will be available again, perhaps he can order a refill.

The problem begins on June 11, when Barrett's prednisone runs out. Dr. Faulks sees Barrett that day and notes in the chart that Dr. McShan "will order the prednisone as indicated." It appears that this did not happen, and for purposes of this motion for summary judgment, the Court finds that it did not.

Barrett files a sick call request on June 20 noting the pain and asking the obvious question: "find out why I only received 4 days of the pain medication." Dr. Faulks sees him on the 24th. High blood pressure is observed, and Dr. Faulks (again) prescribes a Kenalog shot, which appears to have been given.

Dr. Faulks sees Barrett again on the 25th and 27th. He becomes suspicious of malingering and on June 30 gives Barrett his last Kenalog shot. Dr. Faulks determines that Barrett should be referred to pain management.

This should come as no surprise. There was a clear risk of malingering, such that Barrett likely needed to have his medication controlled by Dr. McShan. When Dr. Faulks stepped aside, however, Dr. McShan did not pick up the slack.

Barrett complains about pain via sick call request on July 3, and complains again on July 28. He needs to see Dr. McShan. But Health Assurance's first step response says, "you saw Dr. McShan on 5-28-13 and will have a follow up scheduled in the future with him." Its second step response, from Dr. Faulks personally, says, "I will refer you to see Dr. McShan on his next visit to assess your pain issues." And its July 30 response to Barrett's sick call request says that "Nurse Curry does the scheduling for [Dr. McShan] and *she is aware that you need to see him*, at

6

which [point] then he will provide medication at that time if necessary." (Emphasis added.) But the record does not reflect that an appointment was forthcoming.

Nearly six weeks later, on August 27, Barrett gets to see Nurse Curry about his pain. She added a prednisone prescription – lasting four days – purportedly with Dr. McShan's approval, as well as a 15-day supply of Neurontin, which does treat pain. But there is no record that Dr. McShan assessed Barrett that day. And there is no record that the prednisone was ever administered; the medication logs show only that Barrett could have prednisone "when arrives," and it is never shown as arriving or being administered. The Court assumes it was not administered. The Neurontin, meanwhile, is available and administered, but runs out in 15 days.

It was not enough. On September 6, the nurse says Barrett should be placed on Dr. McShan's "chronic pain list" "ASAP." On September 18, again in pain and with a left arm "a different color than his right arm" according to a nurse, Barrett needed "to see Dr. Faulks or McShan as soon as possible." His pain was a 10 out of 10.

Barrett finally saw Dr. McShan on September 24 and was prescribed Neurontin for pain, with three refills.

### 2. Analysis

The record shows that four months elapsed between visits with Dr. McShan, notwithstanding the fact that Dr. McShan was repeatedly identified as the person who should manage Barrett's pain needs. Three months passed without treatment after Dr. Faulks decided to discontinue pain treatment in deference to Dr. McShan. One month passed after Dr. McShan's nurse logged a four-day prescription for prednisone, a drug which never came, and only gave him 15 days' worth of another painkiller. And after Barrett gave this lawsuit to the legal mail coordinator for mailing, another 11 days elapsed before he saw the doctor at the center of this

lawsuit. One should not have to file a lawsuit to get a medical appointment promised months ago. The delay in treatment indicated in these records is simply too significant for the defendants to secure summary judgment.[1]

Given their admitted knowledge of Barrett's needs and subsequent refusal to treat him, there is a fact dispute on whether the defendants were deliberately indifferent, whether the defendants' soon-to-expire prescription refills evinced a wanton disregard for Barrett's serious medical needs, and whether Health Assurance has a custom of shuttling patients between doctors in deliberate indifference to patients' minimum medical needs. A genuine issue of fact exists; therefore, a jury will have to hear the evidence at trial.

### IV.     Conclusion

The motion for summary judgment is granted in part and denied in part, the R&R is adopted in part and overruled in part, Barrett's objection is overruled in part and sustained in part, the plaintiff's motion to amend is denied, and the plaintiff's motion for judgment as a matter of law is denied.

**SO ORDERED**, this the 7th day of September, 2016.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[1] The evidence in Barrett's case generally aligns with the plaintiffs' allegations in an ongoing class action regarding conditions at confinement at EMCF. That case's "Medical Care" allegations were summarized in this way:

> Plaintiffs allege: (1) EMCF has insufficient staff to provide adequate medical treatment for prisoners, (2) they are often required to wait long periods of time before being seen by a healthcare provider, and (3) prisoners are often treated by nurses regardless of the nature or seriousness of their medical problems. Plaintiffs further allege that they do not always receive their prescribed medications, and that there is insufficient documentation to determine whether their medications are being given or taken as prescribed. Finally, Plaintiffs allege that (1) they are denied treatment for acute or chronic pain and other medical conditions including diabetes and hypertension; (2) they receive untimely and insufficient dental and other medical care; (3) they are required to wait extended periods of time to see specialists, for example ophthalmologists; and (4) recommended treatment plans and corrective surgeries are often denied by prisoner officials.

*Dockery*, 2015 WL 5737608, at *2 (citations omitted).